## CHARLES L. TAPPAN et ux vs. HIRAM B. AYLSWORTH.

A. filed a bill in equity against B., who had been the confidential agent and adviser of A., praying that a deed given by B. to A. might be adjudged a mortgage. The deed was absolute on its face, and B. claimed it to be the consummation of a sale, while A. alleged that it was given and received as security for a loan.

*Held*, that a court of equity will strictly scrutinize such transactions between persons in such relations, and will impose on the agent and adviser the whole burden of sustaining the validity and good faith of his dealings.

*Held*, further, that a court of equity will give relief in such cases by making the holder of the property a trustee for the injured party, by rescinding the contract if necessary, or by ordering the repayment of the money received, and by enforcing the order by an execution.

BILL IN EQUITY for discovery, an account, and the establishment of a lien, praying that a deed absolute in form might be declared a mortgage.

*February* 4, 1882. POTTER, J. The bill charges that the respondent, Aylsworth, on or before September 24, 1875, professed to be the friend of Almira Rice, now Tappan, one of the complainants, and had assisted her in the management of her business, had kept all her deeds, accounts, and papers, had acted as her confidential friend and adviser, and had, by professions of friendship, gained her confidence, and that she placed the greatest trust in him; that the respondent desired to have the use of about $8,000, which the said Almira then had in bank, and applied to her for a loan, and offered to deed to her as security two certain lots of land, and represented that they were then worth

a certain price and would increase in value, and that he would guarantee to her that, at the end of five years, she should suffer no loss, and that out of the proceeds of the land sold, or out of his own pocket, she should receive her money and interest back. The money was advanced and the deed made, but at the expiration of said five years the respondent refused to perform his contract, the lots not being worth anything near the value they had been represented to be. The complainants claim that there was a written guaranty to the effect aforesaid, which was left with the respondent with her other papers, and which he now refuses to deliver to her.

The bill prays that said deed may be declared to be a mortgage; that the said guaranty be delivered to her; that an account may be taken, and the respondent may be decreed to pay to her what may be found due, or that said lots be sold and the respondent be decreed to pay to her the balance over and above the sale of said lots, and for other and further relief, &c.

The answer denies that the respondent applied for a loan or that the deed was given as security, but avers that the sale was absolute and that he never agreed to any guaranty as alleged by complainant. The answer also sets up a claim for services by way of cross-bill, and prays for an account, &c., and the complainant files the usual replication.

There are some facts which are beyond doubt in the case, *i. e.* that the respondent made a deed of two lots of land to the complainant, and that she took her money from the banks where it was deposited and let him have a little over $8,000.

The complainant says it was a loan, and that the respondent promised that, at the end of five years, she should be secure from loss, and also gave a written guaranty.

The respondent contends that it was an absolute and a fair sale, made on the complainant's part because she had become alarmed about the banks and preferred a real estate investment.

The complainants testify to conversations in which the respondent talked of a guaranty, and say that the respondent on one occasion said he had found it. The respondent denies that there was any written or verbal guaranty, and says that all the conversation about a guaranty was meant by him to refer to what he consid-

ered a moral guaranty or obligation he was under, in consideration of certain bequests she had made to him in a will she had executed, and which will she revoked or destroyed after her marriage.

But we do not think it necessary to go further into the question of whether there was a written guaranty, or whether there was a verbal promise or an acknowledged moral obligation, any further than the latter may affect the considerations we shall now refer to.

It appears from all the evidence that the respondent was the confidential agent of Miss Rice. He had been administrator of her father's estate, attended to all her business, kept all her important papers, collected moneys for her; that everything was done under his advice, and that the very deed for which this money was loaned or paid was, without record, given back to him to keep, and remained for some time in his possession. She claims that he was not to charge for services, and October 13, 1877, he agreed in writing to make no charge against her father's estate. He had charged that estate $5,000 ; but he says that this was for his commission on certain property he recovered for the estate, and not for services as administrator.

Now it is a well settled principle of equity jurisprudence that the court will always look with jealousy upon all transactions between parties so situated ; and the burden of proof is entirely upon the guardian, trustee, agent, or other person sustaining this confidential relation, to show that he has taken no advantage of his situation. It is not necessary that there should be fraud to justify the court's interference. In the present case there were all the elements usually found in cases where the courts have granted relief. There was complete ignorance of business affairs, complete confidence, and the dependence resulting from that confidence on one side, and on the other side superior business knowledge, and the influence of his position as administrator of her father's estate. See *Smith* v. *Kay*, 7 H. L. 750.

And we think that from the facts admitted or proved in the case the complainant is entitled to relief. In these cases a court of equity gives relief by converting the holder of the property into a trustee, and decreeing that he hold the property in trust

for the person from whom it was obtained, and decreeing a rescission of the contract if necessary. 1 Story Eq. Juris. §§ 217, 323 ; Perry on Trusts, §§ 170, 194.

But it is contended by the counsel for the respondent that the court cannot make a decree for payment of money in this case. Numerous instances will be found where this has been done. In cases where a trustee or agent has invested funds in land, the court may indeed trace the trust funds into the land, and hold it subject to the trust; and where the property cannot be traced *in specie,* or has gone into the hands of *bonâ fide* purchasers without notice, the trustee will be decreed to make compensation. Hill on Trustees, *522, and cases cited ; 2 Story Eq. Juris. §§ 796, 798. It is done whenever it is incidental to the relief in equity, or when there can be no relief otherwise.

In *Oliver et al.* v. *Piatt,* 3 How. U. S. 333, 355, 396, 401, the U. S. Circuit Court in Ohio had made a decree for a trustee to pay money and execution to be issued therefor, and the U. S. Supreme Court confirmed the decree. In *Flagg* v. *Mann,* 2 Sumn. 486, 566, Judge Story made a similar decree and ordered execution therefor. See, also, *Docker* v. *Somes,* 2 Myl. & K. 655 ; *Armstead* v. *Hundley,* 7 Gratt. 52 ; and the power is expressly recognized in *Hardy* v. *Metropolitan Land and Finance Co.* L. R. 7 Ch. App. 427 ; *Ex parte Shakeshaft,* 3 Bro. C. C. 197 ; *Walker* v. *Simonds,* 3 Swans. 1, 75.

An award of execution is no substantial change of the old English practice, but merely the substitution of a simple and expeditious, for a clumsy and dilatory, mode of proceeding. By the old practice a decree was enforced by process of contempt, and followed, if necessary, by sequestration of the property of the defendant. 3 Daniel Ch. Pr. 1054, 1063. But by the late English rules a more simple practice is introduced, and by our own rules, and by the rules of the Supreme Court of the United States, the process of execution is adopted.

It will be seen by what we have said that several of the issues framed under the rule for the trial of the case are entirely immaterial to the view we have taken.

As to the respondent's claim for compensation for services we cannot see how it can be supported. It appears from all the evi-

dence that the service was entirely voluntary, and on the part of the complainants so understood; and the agreement in writing given by the respondent to the complainant after her marriage, dated October 13, 1877, expresses that he is not to make any charges against her for services in settling the estate, " my service in this matter is only a return for favors shown me by her father, whom I counted my best friend."

A decree may therefore be entered for the rescission of the contract, and for the payment of the money claimed by the complainants, with interest, upon the complainants filing in the clerk's office a deed, properly executed, reconveying said lots of land to the respondent, to be delivered to the respondent on repayment of said money, and that execution issue against the respondent for said moneys if not paid. *Decree accordingly.*

*Benjamin N. Lapham*, for complainants.
*Tillinghast & Ely*, for respondent.